NEBRASKA & IOWA INSURANCE CO. v. JENS SEGARD.

[FILED APRIL 29, 1890.]

1. **Insurance : OVERPAYMENT: RECOVERY: EVIDENCE: REVIEW.**
In an action by an insurance company to recover back money
paid for losses upon property destroyed, which it was claimed
had not been covered by the policy, the testimony on that point
being nearly equally divided and the jury having found for the
defendant, *held*, that the verdict would not be set aside as
being against the weight of evidence.

2. **An instruction** set out in the record, *held*, not erroneous.

ERROR to the district court for Buffalo county. Tried
below before HAMER, J.

*Scott & Scott* for plaintiff in error :

The instruction is erroneous because it is not based on
the evidence (*Neihardt v. Kilmer*, 12 Neb., 38 ; *City of
Crete v. Childs*, 11 Id., 257) ; also, because it raises the issue
of accord and satisfaction, which was not pleaded. (Boone,
Code Pleading, sec. 67 ; *Piercy v. Sabin*, 10 Cal., 30 ;
*Berdell v. Bissell*, 6 Colo., 162.)

*A. H. Conner,* and *Stewart & Rose, contra.*

MAXWELL, J.

This is an action to recover back from the defendant
certain losses paid the defendant which it is alleged the
plaintiff did not insure against. On the trial of the cause
the jury returned a verdict in favor of the defendant, upon
which judgment was rendered.

It is alleged in the petition that "on or about the 11th
day of August, 1886, the plaintiff paid to the defendant
the sum of $74.55 as a loss on a certain building insured
by them in favor of the said defendant; that the said

building had been prior to that time destroyed by fire; and the plaintiff avers that after the payment of the said sum as aforesaid it learned that the said building had not been destroyed by fire as represented, but was still standing and uninjured on the premises of the defendant; that the said sum of money was procured to be paid by fraudulent representation on the part of the defendant and was paid by the plaintiff under a mistake of fact, and that it is entitled to recover the same from the defendant."

To this petition the defendant filed an answer in which he alleges "that on the 11th day of August, 1886, the said plaintiff paid to the said defendant the sum of $74.55 as loss on a certain granary insured by it in favor of the said defendant, after having fully inquired into all the facts pertaining to said loss by fire, and after having fully inspected the premises so burned and destroyed. The said defendant denies that said sum of money was procured to be paid the said defendant by fraudulent representations on the part of the said defendant, and denies that the same was paid by the plaintiff under a mistake of fact, and denies that he is entitled to recover the same from the defendant, and denies each and every allegation in said plaintiff's petition contained not hereinbefore admitted or denied."

The testimony as to the insurance and adjustment of the loss is very conflicting. The policy of insurance introduced is as follows:

"On dwelling house, including foundation, cellar or basement walls, $300. On household furniture therein, $——. On barn No. 2 (including foundations), $——. On granary No. 1, $700. On grain in barns, granary, cribs, dwelling, or in stacks on farm herein described, except on prairie or prairie meadows, $150. On work horses and mules (not exceeding $100 on any one animal) on the premises, or at large within twenty miles of the premises (except in city, town, village, livery, feed, or sale,

stable), and against loss by lightning wherever they may be, $200. On colts and unbroken horses (not to exceed $50 on any one animal) on the premises, and against loss by lightning wherever they may be, $100. On cattle (not to exceed $30 on any one animal) on the premises, and against loss by lightning wherever they may be, $100. On hogs (not to exceed $5 on any one animal) on the premises, and against loss by lightning wherever they may be, $——. On sheep (not to exceed $3 on any one animal) on the premises, and against loss by lightning wherever they may be, $——. All situate (except as otherwise above provided) on and confined to the premises now actually owned and occupied by the insured, to-wit: 80 acres in sec. 32, tp. 9, range 17, township of Odessa, Co. of Buffalo, state of Nebraska."

One Wm. C. Campbell, a witness called on behalf of the plaintiff, testified as follows:

Q. Are you acquainted with the defendant, Jens Segard; and if so, how long?

A. I am acquainted with him since the 9th day of August, 1886.

*        *        *        *        *        *        *

Q. Now state what exhibits "A" and "B" are, and when did you first see them.

A. They are proof of loss and supplements that were made by me in adjusting Mr. Segard's claimed loss, under policy No. 18376 of the plaintiff, the Nebraska & Iowa Insurance Company. They were made out by me on the 9th day of August, 1886.

Q. At whose request were they made out; that is to say, who gave you the facts alleged in the statement "A" and "B"?

A. Mr. Segard, the defendant.

Q. Where was the property situated that the defendant claimed was covered by said policy No. 18376, and claimed

by him to have been destroyed and injured by fire, and for which he claimed pay from the plaintiff?

A. I can give it only as he, Mr. Segard, represented it to me, which is section 32, township 9, range 17 west, Buffalo county, Nebraska, said to belong to defendant.

Q. What property did he claim was covered by the policy and injured or destroyed by fire for which he claimed pay from the plaintiff?

A. It was a shed addition onto the barn twelve feet by thirty-two feet in dimensions.

Q. State what knowledge you had of the premises or of the property claimed to have been destroyed, or of the destruction or injury of any property of the defendant other than what he told you.

A. The only knowledge I had of it was, one of the agents of plaintiff and I were together at Mr. Segard's place and defendant showed us the ashes of the barn; after he showed us I sent the agent that was with me back, and after that Mr. Segard said that there was the loss, and that was what said policy covered.

Q. State what you know about relying upon the truthfulness of the representations made by defendant as above stated, and what did you do with reference to the claim made by the defendant for compensation for alleged loss.

A. I relied upon what he, defendant, said to me, and made out the proofs of loss and recommended the payment of the same.

Q. State what you know about how the defendant was paid for said claimed loss.

A. He was paid by a check and his premium note.

Q. State what you know about the building which he claimed to have been destroyed by fire, the ashes of which he showed you and for which he was paid as you have above stated, not being covered by said policy, and what conversation you had with the defendant about it after he had received pay for it; state fully.

A. I learned from the agent who wrote the application for insurance of the property, J. E. Lawless and C. C. Laurie, after the loss had been paid, that another building that stood west of the one destroyed, said building being 22x22 feet, used as a granary, and described as such in the original application given by the defendant, was the one covered by said policy, and not the building that was burned and for which the defendant was paid. I then called on Mr. Segard at his place and we had a talk about the loss. I wanted and demanded Mr. Segard to refund the money received by him and also amount of premium note and told him that building destroyed was not the building insured and he had misrepresented it to me; he said that he would return all the money he had received and would also deliver up said policy and cancel the insurance but would not deliver up the premium note, or pay it. I told him the company, plaintiff, would not accept that; then he said if they got anything, they would have to sue for it."

One D. B. Whelpton also testifies on behalf of the plaintiff: "I am acquainted with the Nebraska and Iowa Insurance Company five years this month, and first met Jens Segard, to my knowledge, in the spring of A. D., 1887.

Q. Where, and for what purpose, and when, with reference to the time he was paid for a loss under policy No. 18376 of the Nebraska and Iowa Insurance Company?

A. At his premises west of Kearney, Nebraska; to the best of my recollection it was in April, 1887; it was paid for the purpose of having him return the money that was paid to him by the Nebraska and Iowa Insurance Company, on account of his so claimed loss.

Q. For whom were you acting in that regard?

A. For the Nebraska and Iowa Insurance Company, plaintiff.

Q. Did you make any measurements respecting the buildings then standing on defendant's premises? If so,

state how many buildings there were, the size of them, the direction and distance they were from each other.

A. I did; I found at that time three buildings, a dwelling house, a frame barn, and a granary; I measured at that time the granary, which was 22x22; corner post eight feet high; built of frame with shingle roof; that was about 200 feet north and west of his dwelling house; his frame barn stood about 125 or 150 feet due east of the granary.

Q. Which building stood nearest to the highway or road?

A. The granary; it stood about ten feet from what appeared to be the road line. The barn was about 180 feet from the road; the house was about 100 feet from the road to the best of my recollection.

Q. Describe the size, as to probable size, whether there was any shed to it or not, and how long had it been built.

A. The barn was about 30x50 feet; there was no shed that I remember of. The barn was a frame, shingle roof, building; it was built since the fire, I think, on the exact location of the old barn, or thereabouts.

Q. State what you know about his having the old barn insured in the American Insurance Company of Chicago, and of his receiving pay under his policy from that company for the loss of said barn and shed?

A. At this time when I was at his premises Jens Segard informed me that the barn burned was insured in the American Insurance Company of Chicago, and that they had paid him $250 for his loss.

Q. What did you say to him about his wrongfully obtaining money from the plaintiff when his policy did not cover his loss?

A. I introduced myself to him and informed him that I was a representative of the plaintiff, and was there for the purpose of having him refund the amount he had received from plaintiff on that loss by reason of his false representations to the company.

Q. What representations, if any, did you say he had made to the company?

A. I said to him, you claimed that your granary covered by that policy had been burned, but the building covered by the policy and described in your application is still standing there.

Q. What did you say to him, if anything, at that or any other time about his false representations to the company other than you have above stated?

A. I said at that time to him, it is clearly evident that the building covered by the policy of the plaintiff and on which he had insurance as a granary was still standing there, and by your false representations to the company they have paid you this money, and this they did not deny.

Q. What denial, if any, did he make of these charges you made to him?

A. He made none.

Q. State what you next said to him.

A. I said I want this amount of money that the company has paid.

Q. Did he pay you the money or any part thereof?

A. No, sir.

Q. What, if anything, did you say to him about having offered to pay it back to Mr. Wm. O. Campbell, and what was his response to you?

A. I said to him you offered to pay Mr. W. O. Campbell, the agent, for the company, this money; he said he did offer to do so. I asked why he wouldn't do it now; he said he had changed his mind.

The defendant testified in his own behalf in his direct examination as follows:

Q. State if, at the time you insured this granary mentioned in this policy, you informed the agent that you had other insurance on this barn.

\*      \*      \*      \*      \*      \*      \*

Q. You may state if you met with a loss by fire of this barn; if so, state when, as near as you can.

A. Yes, sir; July 29.

Q. State what you did after losing your barn and granary.

\*        \*        \*        \*        \*        \*        \*

A. I went down to see Messrs. Seeley & Caldwell and told them.

Q. Who were Seeley & Caldwell?

A. Insurance agents of this company.

Q. By Mr. SCOTT. Did you say that Seeley & Caldwell were insurance agents of the Nebraska and Iowa Insurance Company at the time you went to see them?

A. Yes, sir.

Q. Do you know that they were at that time?

A. Yes, sir; I notified the company of the loss.

Q. You say then, under your oath, that you know Seeley & Caldwell were the agents of the Nebraska & Iowa Insurance Company at the time you went to see them; how do you know this?

A. I heard through others.

Q. By Mr CONNOR: After going to see Messrs. Seeley & Caldwell, did anybody come out to your place and inspect the premises burned?

A. Yes, sir.

Q. Who came out?

A. Mr. Campbell.

Q. Who is Mr. Campbell?

A. He told me he was inspector for the Nebraska & Iowa Insurance Company.

Q. Is that the same Campbell whose deposition has been read here in evidence today?

A. Yes, sir.

Q. State what Mr. Campbell did when he came out there.

A. He came out and looked at the ashes and asked if

that was my granary. I told him I did not call it a granary, I called it a barn, and that was where I had my grain. He asked what that building was over there (referring to one closer to the road). I told him it was a blacksmith shop and wagon shed and corn crib. He went over and looked at it and finally said, " The corn crib is a granary." I said, "You won't put a bushel of loose grain in it, there are no boards at the sides ; " and then he went over again and looked at the ashes ; then he says, "This is no granary ; it shows well enough where your granary is and you will get your pay for it." We went down to Kearney and was going to—he asked about the other insurance, "If the $200 would cover the loss ? " I said, " No." He asked how much would. I said, " I don't know what the cost of the barn was—what the barn cost me." I told him what the barn cost me ; I building it myself a couple of years ago; that I had bought and paid for the lumber and that I built it myself; that it took me all winter, and I did not know just what the barn did cost me. He says, " Well, we will go down and get a carpenter and get him to figure what it would cost and say what it could be built for." We had a carpenter figure on it and we could not agree about the figures. Mr. Campbell said to him, "I don't believe you know much about it." We then went to another carpenter, and, at the time we went to hunt another carpenter, he said, " I will tell you what I will do, I will pay you for the shed and you can draw your $200 from the other company—I will pay you for the shed and you can draw your $200 from the other company." * * * We went to see another carpenter and figured it up. We figured up what the house cost; he made it $274. He said, " If you are satisfied with that I will pay you that." That is what we agreed to.

Q. Did he pay you for the loss of anything else?

A. Yes, sir; for the loss of the grain.

Q. What did it all come to ?

A. Ninety-six dollars.

Q. By MR. SCOTT: At the time this building, or would-be granary, was burned, did you have any other building besides your house and blacksmith shop?

A. No, sir.

Q. Did you ever keep any grain in this blacksmith's shop or corn crib?

A. No, sir; no oats or wheat, no loose grain had been kept in it; I kept corn in the ear in it.

Q. By MR. CONNOR: You may state, if you remember, of ever meeting an insurance agent by the name of Douglas Whelpton.

A. I don't remember the name.

Q. Do you remember of any agent coming there to see you in regard to paying back the money?

A. Yes, sir; he came and represented himself from the Nebraska & Iowa Insurance Company.

Q. State what conversation took place between you at that time.

A. He came and said that I had got that money for a loss I did not have, and that I must pay it back. I said that I did not; I said that my granary was burned. He claimed that the other building out by the road was the granary, and I said it was not. We had a few words and I got mad and told him to be off the place.

Q. What was said, if anything, on your part about paying back that money?

A. I told him I would not pay it back.

Q. State if you had a conversation with an agent of the company, at any time, where you told them that you would pay it back.

*       *       *       *       *       *       *

A. Yes, sir, I had; Mr. Campbell was up there.

Q. Tell the jury what conversation you had about paying it back.

A. Mr. Campbell came to me, I should think about

three months after I got my money, and he told me that I
got that money under false pre—— (I can't pronounce it);
that I got that money to pay a loss I did not have.   I
told him " I did not."   We had some words about that;
we were talking about it for a while, and finally I said, "If
that is the way your company does business, then I will
give you the policy and the money I received back to them,
and I am done with them."   He said that he did not want
them; he said he wanted the money for the notes besides
that, what the notes come to, the premium notes, and I
said I would not do it.   That is about all—I would not
do it.

Q. State what was said about the company giving up
the premium notes.

A. The premium notes I had before that time, they
were already paid.

Q. State if you had any conversation with any other
person or persons, agents of the company, about giving up
this money.

A. No, sir:

Q. You may state if at any time you offered to return
the money that you had received from the company.

A. I did.

Q. Tell the jury how and under what circumstances
you offered to repay the money. .

A. Mr. Campbell was out and estimated the loss; he
told me that I got that money under false  *   *   *   I
told him "I did not," and we had some talk about that.
After a while I said, "If that is the way the company does
business, I will give you the policies and the money which
I received."   I did not want anything more to do with
the company.   He wanted that money that I received and
the money for the notes; I mean what the notes come to,
and I would not do it.

Q. You may state where the agent was at the time he
took your policy of insurance on this barn and granary.

A. Up at my place.

Q. Whereabouts was he; on the ground or in a buggy?

A. He was sitting in a buggy.

Q. State if he got out of the buggy at any time to inspect the premises.

A. No, sir.

Q. By a JUROR: Were these two granaries and a barn ever under one roof?

A. Yes, sir.

Q. Why was it you put the insurance on the granary as a granary and did not increase the insurance on the barn?

A. I did not want to put insurance on the barn; there was insurance on the whole thing.

Q. You did not understand it was the granary that you were insuring separately?

A. I understood I was insuring the whole barn.

Q. State if anything was said by the gentleman as to the barn carrying more insurance, and, if so, state what he said.

A. Yes, sir; he asked me if I had any insurance on the barn. I told him, "Yes, sir, I have $200." He said, "That is not enough; you ought to have some more." That was not on the day when he brought the application, it was some time before; he said, "You ought to have some more and when you get ready to insure your house we will put some more on the barn."

Q. What was said down there the time when he came to insure it; what did he say when he sat in the buggy?

A. He was sitting in the buggy—he may have been there before and got out and talked with me—he asked me to insure. I told him I was not ready. After talking a little while, the gentleman called me—called me out and had all written out how much he thought it should be and how much I wanted, and he said I could just as well insure that day as any other day. I finally made up my mind. * * * I signed the application.

Q. By a JUROR: Did the gentleman refuse to insure that other building that you had as a blacksmith shop and corn crib?

A. I never asked him to insure it.

Q. By MR. CONNOR: What was this building that the company claims was insured; what was it used for?

A. It was used as a blacksmith shop, and wagon shed, and corn crib.

Q. State if there was any chimney in that blacksmith shop.

A. No, sir.

The court gave the following instruction:

"You will determine whether the plaintiff paid to the defendant the money which it sues to recover under a mistake of fact, because it is not entitled to recover the money unless it was so paid. If the agent of the company went to the place where the fire occurred and examined the premises and was conversant with all the facts in the case and nothing was concealed from him, or suppressed, or kept back by the defendant, and he was not misinformed or misled in any way, but, acting with full knowledge of all the facts pertaining to the insurance and to the loss if any, voluntarily paid the defendant or caused the plaintiff to pay him, the plaintiff cannot recover. And this is true although you may be uncertain as to whether the parties insured the granary contained in the barn, or the granary or the corn crib attached to the wagon shed and blacksmith shop. If the agent who undertook to adjust the alleged loss knew there was a controversy concerning the identity of the property insured and he agreed with the defendant to pay a sum certain in settlement of defendant's claim, the plaintiff cannot recover. At the same time if the plaintiff's agent was misled or not fully informed concerning the property actually insured, and actually burned, and paid the money because of the defendant's misrepresentations or because of lack of knowledge, you may then further in-

Neb. & Iowa Ins. Co. v. Segard.

quire, 1st, what property was insured, and, 2d, was the property insured burned; and if no granary contained in the barn, or attached to it, was insured, you should find for the plaintiff, because such a granary was the only granary burned."

Exceptions were duly taken to this instruction, and the giving of the same is now assigned for error.   The court had previously instructed the jury as to the rights of the respective parties and the instruction in question no doubt was correct as applied to the evidence in the case.

The plaintiff sent its adjuster there to estimate and adjust the loss.   He went upon the ground where the loss had occurred and, presumably with the policy before him, he in effect certified that certain property covered by the policy had been destroyed by fire.   Unless there was collusion between the insured and adjuster, which is not charged, or a mistake in some important particular, his decision would be binding on his company.

In case of fraud or deception by the insured, by reason of which the company was compelled to pay for losses which it had not insured against, the adjustment would not be final, and the action could be maintained, and, the instruction in question so informs the jury.   There was no error, therefore, in giving the same.

It is apparent that there is no material error in the record and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.